THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BARNEY LONZO, Defendant-Appellant.

First District (2nd Division)   Nos. 62187, 76-137 cons.

Opinion filed April 19, 1977.

940

David C. Thomas, of Clark, Thomas & Piers, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Barney Lonzo, appeals from a conviction of attempt murder and a sentence of 15 to 60 years imprisonment. The jury returned verdicts of guilty of attempt murder and aggravated battery, and judgments were entered on the attempt murder verdicts. On appeal defendant raises the following contentions: (1) he was improperly denied his statutory right to a speedy trial; (2) the trial court erred in excluding scientific evidence; (3) the trial court erred in allowing an Assistant State's Attorney to testify that defendant was guilty of the crime charged; (4) the trial court erred in admitting testimony that defendant committed other crimes; (5) the trial court improperly delayed a ruling on the use of an

involuntary statement; (6) defendant was neither proved guilty as principal beyond a reasonable doubt nor was he accountable for the crimes of another; and (7) the sentence of 15 to 60 years was excessive.

We affirm.

In the early morning hours of Sunday, April 8, 1973, two Chicago policemen, Ernest Kanzler and John Ferrell, were shot and seriously wounded at an apartment building in Chicago, Illinois.

Curtis Bolton, the attendant at a Clark Oil gasoline station, called the police at 7 a.m. on the Sunday in question when he saw two men "lurking" behind the station. As the police arrived defendant and Daniel Underwood entered the hallway of a building located a short distance from the gas station. Defendant argues that Underwood compelled him at gunpoint to ascend the stairs while Underwood unscrewed a light bulb at the first landing. Two policemen, Kanzler and Albert Drink, then entered the building and told the men to come down. When Kanzler saw one of the men "hanging" over the bannister and pointing a gun at his head, he turned to escape injury. A shot was fired and Kanzler was hit in the leg. Drink then assisted Kanzler and arranged for further police assistance. At trial both Kanzler and Drink identified defendant as the assailant.

Subsequently defendant and Underwood fled through the apartment building. Fifteen-year-old Eugene Melton testified that defendant and Underwood came running through his family's apartment on the morning of April 8, 1973. Melton declined Underwood's request that he take a gun from Underwood.

Three policemen, Ferrell, James Cool and Guido Colonna, pursued a "huge male Negro" wearing a green jacket and carrying a large automatic pistol as he came through the alley and the gangway. Upon arrival at the back of the building, Ferrell was shot in the face from a distance of 20 to 25 feet. At trial Ferrell identified defendant as the man who shot him.

Bertha Young and her daughter, Annette, who also resided in the apartment building, testified that they admitted defendant and Underwood to their apartment when "they said it was police." Underwood gave Annette a gun and two metal pieces which at his command she hid in a closet.

The jury returned verdicts of guilty of aggravated battery and attempt murder, and judgment was only entered on the attempt murder. Defendant was subsequently sentenced to 15 to 60 years imprisonment.

Defendant's first contention is that the trial court erred when it denied his motion for discharge on the ground that he was not tried within 160 days from the date he demanded trial. (Ill. Rev. Stat. 1973, ch. 38, par. 103—5(b).) Defendant claims that although he agreed to a continuance of a State motion from August 22, 1974, to August 28, 1974, this continuance

in fact was neither sought nor caused by him and thus his motion for discharge should have been granted.

The record reveals that on June 17, 1974, the trial court ruled that certain statements of defendant were to be suppressed at trial because they were obtained as a result of the physical coercion of defendant. On August 1, 1974, the State filed a motion requesting a rehearing on the suppression ruling, which motion was set for hearing on August 22, 1974. The State alleged that an error existed in the transcript of part of the hearing on the motion to suppress. On August 22, 1974, however, while the court reporter who had prepared the transcript was in court prepared to testify, defendant failed to appear. Defense counsel apologized that the testimony could not be taken and suggested: "if the case is to be continued can we continue it for Wednesday, the 28th?" The trial court then continued the hearing on the motion to August 28, 1974. .

In support of his contention that the delay on August 22 was not caused by him, defendant alludes to *People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242; *People v. Nunnery* (1973), 54 Ill. 2d 372, 297 N.E.2d 129; and *People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529. In each case there was an analysis of the criteria for determining whether a defendant's acts in fact caused or contributed to a delay. The facts in each instance were carefully examined by the court "to prevent a 'mockery of justice' either by technical evasion of the right to speedy trial by the State, or by a discharge of a defendant by a delay in fact caused by him." *Fosdick*, at 529.

Defendant in the case at bar while on bond made his first demand for trial on July 15, 1974. Subsequently he filed his petition for discharge on January 6, 1975, 176 days from the date of his first demand for trial. During the intervening period, however, a hearing was set for August 22, 1974, because of a court reporter's typographical error. When defendant failed to appear for that hearing, defense counsel's offer to waive defendant's presence was declined by the trial court. Defense counsel then suggested August 28, 1974, as the continuance date of the case, and the court so continued the motion. No suggestion was made concerning any stipulation to the testimony of the court reporter.

■▌ We conclude that defendant has failed to overcome the onus of having caused the delay. Defense counsel himself suggested a continuance of the *case* rather than the *motion* and made no demand for trial at the time of the agreed continuance. Defendant's absence together with the actions of his attorney indicate a delay occasioned by defendant. We are thus of the opinion that the trial court properly denied defendant's motion to discharge.

Defendant further asserts that the trial court abused its discretion when it excluded scientific evidence offered to corroborate defendant's

testimony that he did not fire any weapon. Defendant relies upon *People v. Carbona* (1st Dist. 1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, in stating that:

> "Experiments may be received into evidence if probative of facts in issue and were conducted under substantially similar conditions and circumstances as those which surrounded the original transaction or occurrence. (*State v. Atwood* (1959), 250 N.C. 141, 108 S.E.2d 219; *People v. Willson*, 401 Ill. 68, 81 N.E.2d 485; see also Annot. (1962), 86 A.L.R. 2d 611.) The admissibility of experimental evidence is a matter within the discretion of the trial court. A reversal is not warranted unless the clear abuse of discretion is demonstrated. *Hardman v. Helene Curtis Industries, Inc.*, 48 Ill. App. 2d 42, 198 N.E.2d 681." *Carbona*, at 1003—04.

■■ Tests were conducted in the case at bar in an effort to demonstrate that defendant could not have fired the gun. The jacket worn by Underwood was found to contain more lead ions than the jacket worn by defendant. A similar gun and two jackets containing the same amount of cotton as those of Underwood and defendant were used on a gun range in a simulated reenactment of the shootings. However, these tests were performed 13 months after the occurrence with no explanation for the delay. Moreover, disputes exist concerning the type of material comprising the jackets worn at the time of the shootings and the material used in the manufacture of the control jackets. There is no indication as to what materials other than cotton constituted the remainder of the respective garments. Also the experiment was performed on a gun range while the actual shootings occurred in a stairwell and in an outdoor gangway. In the experiment the "spectator" stood six feet from the shooter, but defendant testified that he stood two to three feet from Underwood at the time of the stairwell shooting. We believe the experiments did not accurately represent conditions and circumstances which surrounded the original occurrence. The trial court properly excluded these tests.

Defendant maintains that the admission of the testimony of an Assistant State's Attorney to rehabilitate an impeached witness was reversible error. It is improper and prejudicial for the State to offer a prosecutor's testimony that he had recommended a charge of murder be placed against a defendant. (*People v. Blissitt* (1st Dist. 1973), 12 Ill. App. 3d 551, 299 N.E.2d 562.) A defendant, however, may not complain about lines of inquiry which he has invited. *People v. Carbona* (1st Dist. 1975), 27 Ill. App. 3d 988, 1006, 1007, 327 N.E.2d 546, 563.

Defense counsel in the instant case sought to introduce the preliminary complaint signed by Kanzler against Daniel Underwood in which Underwood was charged with shooting Kanzler. Such strategy was

apparently an attempt to impeach Kanzler's testimony that defendant shot him. Assistant State's Attorney Neville, however, was allowed to explain the legal meaning of a "complaint." He testified that a complaint states the charge, not the theory of the case, and he explained "accountability" as a legal term "to indicate that an individual can be liable for a crime that is committed by someone else." Neville had prepared the complaints against both Underwood and defendant.

■■ Defendant introduced the complaint in an apparent attempt to impeach Kanzler. This trial strategy resulted in the testimony of Assistant State's Attorney Neville explaining to the jury the seeming contradiction in the complaints. Defense counsel should have assumed the prosecution would call Neville as a witness should the complaints be admitted into evidence and yet defense counsel did not object until after the complaints were admitted into evidence. While the prosecution's procedure was not commendable, we find defendant has waived his objection to the testimony of Assistant State's Attorney Neville. Defendant may thus not complain about the testimony which he caused to be offered.

Defendant also argues that the trial court improperly admitted evidence suggestive of other crimes when it allowed "prejudicial" testimony that "suspicious men" were "lurking" in the vicinity of the Clark Oil gasoline station prior to the shootings.

Defendant in the instant case filed a motion *in limine* in an effort to bar reference to "suspicious" men or "suspicious" activity at the Clark station prior to the shootings. The trial judge, however, admitted some testimony regarding the phone call to the police to explain why the police were searching the building here involved on a Sunday morning. Curtis Bolton, the gas station attendant, testified that he saw two heads "dodge" behind the Clark sign and saw the legs of two figures under the sign. He then called the police to tell them there were "two men lurking behind the Clark service station." Policeman Kanzler related that he and his partner responded to a radio call regarding two "suspicious" men at the Clark station. The jury was then instructed that this testimony was to be considered only to show that these policemen were responding to a call and not for the truth or falsity of the station attendant's characterization.

We are well aware that evidence that a defendant committed another crime totally disconnected from the crime for which he is being tried is inadmissible. (*People v. Deal* (1934), 357 Ill. 634, 192 N.E. 649; *People v. Brown* (1st Dist. 1972), 3 Ill. App. 3d 1022, 1024, 279 N.E.2d 765.) Nonetheless, our courts have even deemed admissible evidence of another crime where it is independently relevant and, "for example, where it shows motive or intent, identity, absence of mistake or accident, or the existence of a common scheme or design." (*People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506.) The balance between the

probative value of such evidence and the prejudicial effect upon the jury of its admission is within the sound judicial discretion of the trial court. *People v. Olivas* (1st Dist. 1976), 41 Ill. App. 3d 146, 151, 354 N.E.2d 424.

■■ ■ We consider the references to "suspicious men" who were "lurking" in the vicinity of the Clark station to be so closely connected with the shootings that occurred early Sunday morning, April 8, 1973, as to form a part of a chain of relevant circumstances. Had this limited testimony not been admitted, the jury would have been faced with the unexplained fact that policemen suddenly appeared within an apartment building for no apparent reason. The trial judge limited the testimony and carefully instructed the jury concerning the purpose of the testimony. Moreover, the references to "suspicious" and "lurking" do not alone constitute an accusation of other crimes. We thus believe that the trial judge exercised proper judicial discretion in balancing the probative value of this testimony with any prejudicial effect the testimony may have had upon the jury.

Defendant further contends that he was denied due process of law when the trial court delayed ruling on the use by the State of defendant's allegedly involuntary statement. He cites *People v. Hiller* (1954), 2 Ill. 2d 323, 118 N.E.2d 11, in asserting that it is error for a court to permit the prosecution to use a defendant's involuntary or coerced statement as the basis for impeachment.

The trial judge first suppressed a statement by defendant to an Assistant State's Attorney, holding the statement to be of involuntary nature. Defendant gave the statement concerning his activities with Underwood prior to the shootings because of alleged acts of police brutality. Upon a rehearing of the motion to suppress, however, the trial court reopened its consideration of the allegedly involuntary statement and deferred to a later date its ruling on the motion to suppress.

At trial two questions were put to defendant concerning his statement to the Assistant State's Attorney. Defendant was asked whether he had ever told anyone that he had gone to Underwood's home on the morning of April 8, 1973, to practice martial arts and further whether he had ever told anyone that he had been with Underwood the night before. Defendant answered "no" to both questions, and the trial court subsequently ruled that the statement could not be used for impeachment.

Whether the statement in question was voluntary or involuntary, we see no serious prejudice to defendant in the two questions relating to his activities with Underwood. We therefore conclude that any error which may have resulted from the court's delay in suppressing defendant's statement was harmless.

■■ Defendant maintains that he was neither proved guilty beyond a reasonable doubt of actually shooting the victims nor was he proved guilty on a theory of accountability. He points to the testimony of three eyewitnesses and asserts that circumstances during and after the commission of the crimes raise doubt concerning their identification of defendant as the person who fired the gun.

Two policemen, Albert Drink and Ernest Kanzler, identified defendant as the man who shot Kanzler. Kanzler testified that he entered the building, looked up and saw a man "hanging" over the bannister and pointing a large caliber automatic weapon at Kanzler's head. The gunman was described as having a medium Afro and wearing a green army fatigue jacket "with epaulettes." He was almost close enough for Kanzler to be able to grab the gun. However, while Kanzler identified defendant at trial as the man who shot him, cross-examination revealed that he had been unable to identify defendant at the preliminary hearing. At the time of such preliminary hearing Kanzler was in a "body cast" from his shoulders to the end of his foot and could only observe defendant from a side view in the courtroom.

Drink testified that he entered the building with Kanzler and saw a man wearing a green army jacket and blue sweater point a gun at Kanzler's head. Drink corroborated Kanzler's identification of defendant as the man who shot Kanzler.

Policeman Ferrell, the second shooting victim, also identified defendant as the man who shot him. He stated that he and two other policemen saw defendant come from the gangway and chased defendant to the back porch of the building. According to Ferrell, defendant then shot him in the face from a distance of 20 to 25 feet. Ferrell, however, did not identify defendant prior to trial.

It is undisputed that Underwood attempted to give the gun to young Eugene Melton in the first apartment entered by Underwood and defendant. Moreover, it is undisputed that Underwood did give the gun and clips of ammunition to Annette Young in the second apartment. Thus, accepting the testimony of Melton, Young and the three policemen as true, the jury may have believed that the gun was passed from defendant to Underwood. The fact, however, that the jury asked for further instruction on accountability points toward their consideration of that legal premise. In any event, we believe the jury had sufficient evidence to find defendant guilty as principal.

Defendant argues that he was not accountable for any crimes committed by Daniel Underwood since defendant and Underwood had no plan or common design to commit a crime, and defendant's mere presence at the scene of the shooting does not make him legally

accountable.[1] While mere presence or flight from the scene of a crime does not make a person a principal (*People v. Whittenburg* (1st Dist. 1976), 37 Ill. App. 3d 793, 347 N.E.2d 103), proof that a person was present without opposing or disapproving may be considered by the trier of fact, along with other circumstances, in determining whether the accused gave countenance and approval, thereby aiding and abetting the crime. (*People v. Cole* (1964), 30 Ill. 2d 375, 196 N.E.2d 691.) Moreover, in *People v. Tate* (1976), 63 Ill. 2d 105, 112, 345 N.E.2d 480, 484, the supreme court stated that "* * * the jury could have found that defendant had 'embarked upon a course of action which was dangerous in character and could reasonably be expected to require the use of force that might result in the death of a human being.' [*People v. Hughes*] (26 Ill. 2d 114, 120.)"

■■ Defendant argues he was apprehended in a strange house with Underwood after being forced by Underwood to enter the building and to remain there against his will. Defendant testified that he never fired the gun and that he twice endeavored to give himself up and withdraw from the above recited events. At no time, however, did he call out his intentions to the police. Furthermore, defendant ran past Underwood during the subsequent pursuit and broke a window in endeavoring to avoid capture. No attempt by defendant to dissociate himself from the commission of the foregoing offenses is found in the record. After a careful examination of the record, we believe the jury had sufficient evidence to find defendant guilty as a principal or guilty on a theory of accountability.

■■ Finally, we believe defendant's remaining contention concerning the excessive nature of his sentence is without merit. The minimum and maximum sentence for a class one felony is established by section 5—8—1(b)(2), (c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(2) and (c)(2)). While defendant was only 19 years of age and his record reflected two less serious offenses of theft and

---

[1] The Criminal Code states that a person is legally accountable for the conduct of another when:

"(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. However, a person is not so accountable, unless the statute defining the offense provides otherwise, if:

* * *

(3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense." Ill. Rev. Stat. 1973, ch. 38, par. 5—2(c).

948

battery, the offenses in this instance could easily have resulted in the deaths of two policemen. These senseless shootings did cause permanent and serious injuries to both victims.

Accordingly the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DOWNING, P. J., and STAMOS, J., concur.